## AMERICAN LUMBER CORPORATION, Appellant

v.

## NATIONAL RAILROAD PASSENGER CORPORATION.

No. 89–1340.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(b) Sept. 6, 1989.

Sept. 22, 1989.

Harold E. Kohn and Marguerite R. Goodman, Kohn, Savett, Klein & Graf, P.C., Philadelphia, Pa., for appellant.

Michael J. Mangan and Ronald P. Schiller, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellee.

Before MANSMANN, NYGAARD and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

MANSMANN, Circuit Judge.

In this contract dispute, resolved by the district court's grant of summary judgment to National Railroad Passenger Corporation (AMTRAK), the appellant American Lumber Corporation urges us to reverse the district court's grant of summary judgment on the basis that the release signed by American Lumber's assignor did not contemplate the current breach of contract action. Additionally, American Lumber urges us to reverse the district court's denial of American Lumber's motion to compel the production of information sought through a Freedom of Information Act request. We hold that the district court did not err in granting summary judgment in favor of AMTRAK on the basis of the release signed by American Lumber's assignor. Furthermore, we conclude that, under the facts presented here, information provided by AMTRAK in response to a FOIA request is not subject to Rule 26 discovery.

I.

American Lumber Corporation is a wholesale distributor of building materials, including railroad ties and switch timbers. AMTRAK purchased ties and timbers in connection with a federally-funded improvement program administered by the Federal Railroad Administration. We are here concerned with five written contracts in which Roscoe Murphy Jr., Inc. (Murphy) agreed to sell a specific number of ties to AMTRAK for a set price. Murphy was awarded the contract under AMTRAK's Minority Business Enterprise (MBE) program. Later AMTRAK learned that Murphy was engaged in a joint venture with American Lumber.

Murphy delivered ties to AMTRAK, which AMTRAK accepted, and invoiced AMTRAK at the contract price. All but one of the purchase orders contained a price revision clause which permitted the contract price to be adjusted only on the basis of changes in labor and material costs. In addition, the purchase orders contained an express prohibition on the

modification of the contract except in writing signed by the contracting officer.

AMTRAK paid over 100 invoices submitted by Murphy at the contract price. Murphy then told AMTRAK's Purchasing Department that his costs had increased and requested escalation pursuant to the price revision clause. Because Murphy complained of a cash flow problem, he convinced the AMTRAK personnel to pay his invoices at the escalated prices, while he obtained the necessary supporting documentation from the lumber mills. This scheme came to a halt, however, when the Accounts Payable Department refused to pay subsequent invoices because the submitted prices did not reflect the purchase order prices.

In 1978 and 1979, Murphy filed civil rights complaints against AMTRAK in the United States District Court for the Eastern District of Pennsylvania based on claims of racial discrimination in regard to AMTRAK's methods of awarding contracts. On June 3, 1981, Murphy signed a release which was the result of a settlement between Murphy and AMTRAK in which Murphy agreed to withdraw all claims against AMTRAK in return for consideration of $36,500.

In September, 1983, American Lumber filed a complaint in the Court of Common Pleas of Philadelphia County against AMTRAK claiming to be Murphy's assignee and third-party beneficiary of the Murphy–AMTRAK contracts. AMTRAK removed the action to the United States District Court for the Eastern District of Pennsylvania on January 1, 1986. On June 24, 1986, American Lumber filed for relief in United States Bankruptcy Court for the Eastern District of Pennsylvania. With the district court's approval, AMTRAK filed a counterclaim against American Lumber alleging that its overpayment to Murphy occurred as a result of fraud, breach of contract, unjust enrichment and violation of the Racketeer Influenced Cor-

rupt Organization (RICO) statute, 18 U.S. C.A. § 961 *et seq.* (West 1984).[1]

During discovery, the district court granted numerous extensions to both parties—but more particularly to American Lumber—to file responses and amend pleadings. Additionally, the court extended the discovery deadline three times at American Lumber's request. After the district court refused to grant the fourth extension, American Lumber issued a Freedom of Information Act (FOIA) request to AMTRAK. When AMTRAK submitted a list of documents it felt were exempt from FOIA disclosure, American Lumber filed a motion for sanctions on the ground that AMTRAK was intentionally withholding discovery material. The district court denied American Lumber's motion for sanctions.

AMTRAK moved for summary judgment on grounds that (1) American Lumber's claims were barred by a release executed by its assignor, Murphy, on June 3, 1981, and (2) American Lumber's claims were barred by Clause 48 of the purchase orders which prohibited oral modification. The district court granted summary judgment for AMTRAK and American Lumber moved for reconsideration. American Lumber also moved to compel the production of documents by AMTRAK and to dismiss AMTRAK's counterclaim against American Lumber. The district court denied these motions. With respect to AMTRAK's counterclaim, the district court stayed all proceedings on the counterclaim without prejudice to AMTRAK seeking relief from the stay in bankruptcy court. This resulted in the entry of a final judgment. American Lumber appeals from the denial of its motions and the granting of the motion for summary judgment to AMTRAK.

 Our review of the district court's grant or denial of a motion for summary judgment is plenary. We must determine whether there exists a genuine issue of material fact or whether the moving party

---

**1.** Through the discovery process in this lawsuit, AMTRAK learned that Murphy had been paid $1,316,100 in excess of the original contract prices but his actual cost increase had only been $364,941 leaving a balance due AMTRAK of $951,159.

is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Review of the district court's decision concerning discovery motions, however, is limited to a determination of whether the district court abused its discretion. Consequently, it is American Lumber's burden as appellants to demonstrate that the district court's failure to compel AMTRAK to produce the documents deprived American Lumber of critical evidence or otherwise resulted in fundamental unfairness. *Wisniewski v. Johns–Manville Corp.*, 812 F.2d 81, 90 (3d Cir.1987).

## II.

American Lumber's first contention is that the 1981 release of Murphy's racial discrimination suit against AMTRAK does not bar American Lumber's contract suit. American Lumber argues that the release was intended to bar only Murphy's discrimination claims and does not apply to the contract claims. Conversely, AMTRAK contends the 1981 settlement was in the form of a general release which released all of Murphy's claims: those currently being asserted as well as those which could be asserted by Murphy. Since American Lumber's claims are those assigned to it by Murphy, AMTRAK argues, the claims which could have been asserted by Murphy were released by the 1981 settlement.

We must examine the language of the release to determine whether it is limited to a release of the racial discrimination claims, as American Lumber contends, or whether it is a general release of all claims, as AMTRAK contends.

The 1981 release states in pertinent part:

### THIS IS A RELEASE

\* \* \* \* \* \*

Roscoe Murphy, Jr. and Roscoe Murphy, Jr., Inc., ... do remise, release, quitclaim and forever discharge NATIONAL RAILROAD PASSENGER CORPORATION, its officers, directors, employees, representatives, agents predecessors, successors and *assigns*, from any and all

manner of claims, actions, causes of action, damages, costs, expenses and compensation whatsoever which ROSCOE MURPHY, JR. and ROSCOE MURPHY, JR., INC., or either of them, *asserted or could have asserted* against NATIONAL RAILROAD PASSENGER CORPORATION ... in the legal actions captioned ROSCOE MURPHY JR., and ROSCOE MURPHY, JR. INC., v. NATIONAL RAILROAD CORPORATION, Nos. 78–4149 and 79–3766, pending in the United States District Court for the Eastern District of Pennsylvania, which actions are to be dismissed with prejudice.

[T]his release shall be complete and shall not be subject to any claim of mistake of fact and that it expresses a FULL AND COMPLETE STATEMENT of liability claimed and denied and ... is intended to avoid litigation and to be final.

ROSCOE MURPHY JR. and ROSCOE MURPHY, JR., INC. further agree ... that there is absolutely no agreement or reservation not clearly expressed herein, that the sum of money stated herein is all that both are ever to receive and that the execution hereof is with full knowledge that it covers *all possible claims.*

Appendix at 166 (emphasis added).

The express language clearly states that Murphy released all claims which he asserted or could have asserted against AMTRAK in the lawsuits. Thus, we must determine whether the contract claims asserted by American Lumber could have been asserted by Murphy.

Initially, we note that the contract claims pressed here by American Lumber had fully ripened at the time Murphy executed the release. American Lumber's complaint alleges, *inter alia*, that AMTRAK accepted lumber products (ties) from American Lumber during the period July, 1978 through January, 1981 and continues to use $750,-000 worth for which Murphy was not paid. With respect to those products, the record discloses that by letters dated June 23, September 9, and October 9, 1980 AMTRAK denied payment of the invoices submitted by Murphy because Murphy was

behind in his deliveries and because the invoices did not reflect the contract purchase order price. Murphy was specifically told that "until such time as the contract is officially modified to reflect any price revisions, our Accounts Payable Department will not honor and, in fact, will return any invoice wherein the invoice price does not match the subject purchase order price." Appendix at 141. Clearly, Murphy was fully aware by October, 1980, that AMTRAK was challenging his invoice submissions and Murphy could have brought a claim for breach of contract at that time.

■ The parties agree that Pennsylvania substantive law of contract interpretation applies to the terms of the release, while federal procedural law applies to the procedures involved in bringing and maintaining Murphy's lawsuit in federal court. We turn here to federal procedural law and Murphy's federal lawsuit. Under the Federal Rules of Civil Procedure, there was no procedural bar which would have prohibited Murphy from including the contract claims in his discrimination suit against AMTRAK. The liberal amendment of pleadings permitted by Fed.R.Civ.P. 15 would have allowed Murphy to amend his complaint to include the ripened contract claims. Following this policy of liberal amendment, we have permitted the amendment of complaints even years after the filing of the original lawsuit. *See, e.g., Howze v. Jones & Laughlin Steel Corp.,* 750 F.2d 1208 (3d Cir.1984) (delay alone is an insufficient reason to deny amendment). The "touchstone is whether the non-moving party will be prejudiced if the amendment is allowed." *Howze,* 750 F.2d at 1212. American Lumber does not allege—nor is there any evidence in the record—AMTRAK would have been prejudiced by Murphy amending his discrimination suit to include the contract claims of which both parties were fully cognizant at the time of the release.

Moreover, Rule 18 of the Federal Rules of Civil Procedure permits a party to join as many legal, equitable or even maritime claims as the party has against the opposing party. These claims can be independent or alternate claims to the original complaint. As AMTRAK notes, the parties to both the discrimination suit and the contract dispute are the same, the witnesses are the same and many of the underlying facts of both cases are the same. Clearly, from a standpoint of judicial economy, a joinder of the two actions would have been more convenient for both parties. We conclude that the present action could have been brought by Murphy prior to the release of his claims on June 3, 1981.

American Lumber asks us to distinguish between the release here and the release upheld by us in *Three Rivers Motor Co. v. Ford Motor Co.,* 522 F.2d 885 (3d Cir.1975) because the document here does not contain the language "general release" as in *Three Rivers.* Without the presence of the language, American Lumber contends, the only claims Murphy intended to release were the racial discrimination claims he asserted or could have asserted. We disagree with this narrow reading of *Three Rivers* which more properly turned on the general language of the *document* rather than on the title of it.

*Three Rivers* involved an anti-trust suit brought by Three Rivers Motors, a franchisee, against the Ford Motor Corporation. Several years prior to the suit at bar, Three Rivers complained that because another local competitor franchisee, Triangle Motors, operated in the same area, Three Rivers had suffered considerable operating losses. The president of Three Rivers began negotiations to resign the franchise with Ford, but did not wish to sacrifice the loss of the corporate investment in parts and accessories. Three Rivers succeeded in negotiating a settlement with Ford in which Ford agreed to buy Three Rivers' inventory in return for the execution of a general release. *Three Rivers,* 522 F.2d 887. Three Rivers would then move to another location which was not in direct competition with another Ford franchise. A few years later, Three Rivers brought an anti-trust suit alleging that Ford had violated anti-trust law by entering into a price fixing arrangement to enable fleet customers to purchase their new vehicles from Triangle Motors, Three River's old competitor. The question

before us was whether the general release was broad enough to encompass the antitrust claims, thereby barring the action against Ford. 522 F.2d at 888. We concluded that "[u]nless the comprehensive language releasing all types of claims is to be read as much ado about nothing, the release must cover more than those claims arising from Ford's repurchase of Three Rivers' inventory." 522 F.2d at 897.[2] "The only reasonable conclusion is that the release was intended as a general settlement of accounts." *Id.*

■ Returning to the release at issue here, we find the same general language present that existed in the *Three Rivers'* release. Of significance is the language in the second paragraph which provides that "the sum of money stated herein is all that both [Murphy and Murphy, Inc.] are ever to receive and that the execution hereof is with full knowledge that it covers *all possible claims.*" Unless we are to disregard the plain language of the release, we must conclude that the parties to the agreement intended that the release was to cover all claims Murphy had asserted against AMTRAK or could have asserted. Moreover, if Murphy himself had attempted to bring an action for breach of contract against AMTRAK after the June 3, 1981 release was signed, his action would have been barred. Since American Lumber, as Murphy's assignee, can possess no greater rights than its assignor, its action is also barred. *General Electric Credit Corpora-tion v. Security Bank*, 244 A.2d 920, 923 (D.C.App.1968) ("an assignee of a chose of action takes it subject to all defenses, including any valid set-off based on facts existing at the time of the assignment").[3]

American Lumber also argues that AMTRAK waived the statute of frauds provision (Clause 48) in the contract which prohibited oral modification of the contract when AMTRAK paid some of the invoices Murphy had submitted before protesting about his failure to follow the procedure for price revision. Because we have determined that the district court properly held that Murphy's release of claims against AMTRAK bars American Lumber's lawsuit, we have no need to decide this issue.[4]

### III.

■ American Lumber's final argument is that the district court erred by denying American Lumber's motion to compel the production of documents discovered in response to American Lumber's Freedom of Information Act request. We note at the outset that the Supreme Court has generally looked with disfavor upon parties that have tried to use the FOIA to circumvent the discovery rules. A party's contention that it can "obtain through the FOIA material that is normally privileged would create an anomaly in that the FOIA could be used to supplement civil discovery. We have consistently rejected such a construction of the FOIA." *United States v. Weber Aircraft Corp.*, 465 U.S. 792, 801, 104

---

2. The operative portion of the Ford release stated:

> of and from all and all manner of action and actions, cause and causes of action, suits, debts, dues, ... controversies, agreements, promises, variances, trespasses, damages, judgments, ... whatsoever in law, in admiralty or in equity, which against Ford, ... ever had, now have or which they or any of them hereafter can, shall or may have....

*Three Rivers*, 522 F.2d at 895.

3. We cite to a District of Columbia case because the parties agree that District of Columbia law applies to the assignment of Murphy's accounts receivable to American Lumber since the contract was created in the District of Columbia.

4. In addition, American Lumber appeals from the district court's denial of America Lumber's motion to modify the order granting summary judgment to AMTRAK on the grounds that the price revision clauses in the contracts at issue were governed by market costs rather than the supplier's actual costs. Since we have already concluded that the district court properly determined that American Lumber's claim is barred by the release, we do not need to address this issue.

American Lumber also appeals from the district court's denial of its motion for reconsideration on the basis of newly discovered evidence. This argument is baseless in light of the district court's decision which denied the motion on the merits because the evidence submitted by American was not "newly discovered". We will not disturb the district court's determination absent an abuse of discretion, which certainly did not occur here.

S.Ct. 1488, 1493, 79 L.Ed.2d 814 (1984). *See also Baldrige v. Shapiro,* 455 U.S. 345, 102 S.Ct. 1103, 71 L.Ed.2d 199 (1982) (disclosure of exempt information by way of civil discovery would undermine the purpose of confidentiality envisioned by Congress); *and, National Labor Relations Bd. v. Sears, Roebuck & Co.,* 421 U.S. 132, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975) (the primary purpose of the FOIA was not to benefit private litigants or to serve as a substitute for discovery).

The district court did not merely accept AMTRAK's statement that the records were exempt and therefore, not applicable to the lawsuit. The district court carefully scrutinized the documents *in camera* before determining that the information contained therein would not change AMTRAK's responses to interrogatories. Consequently, the district court denied American's motion on the merits, rather than on the basis of policy reasons. We cannot say that the district court abused its discretion by denying American's motion in light of that determination.

## IV.

We conclude that the district court did not err by granting summary judgment for AMTRAK on the basis that American Lumber's assignor had released all claims against AMTRAK. Nor did the district court abuse its discretion by denying American Lumber's motion for reconsideration or its motion to compel production. For the above reasons, we will affirm the judgment of the district court granting summary judgment for AMTRAK.