## In re CHICAGO PARTNERSHIP BOARD, INC., Debtor.

Adversary No. 97 A 1673.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Aug. 17, 1999.

Mark L. Prager, John R. Landis, Jill L. Uylaki, Foley & Lardner, Chicago, IL, for trustee.

J. William Holland, Holland and Holland, Chicago, IL, trustee.

Daniel J. Voelker, Brad S. Grayson, Schwartz & Freeman, Chicago, IL, for Claimant Paul Mitchell.

William Seckinger, Associate General Counsel, Securities Investor Protection Corp., Washington, DC.

### MEMORANDUM OPINION

JOHN H. SQUIRES, Bankruptcy Judge.

This matter comes before the Court on the motion of J. William Holland, as Trustee (the "SIPA Trustee") for the liquidation of the business of Chicago Partnership Board, Inc., and a hearing on the opposition to his determination regarding the claim of Paul M. Mitchell ("Mitchell"). For the reasons set forth herein, the Court sustains the determination of the SIPA Trustee to disallow the claim of Mitchell as a "customer" claim as defined in 15 U.S.C. § 78*lll*(2) on account of a "security" as defined in 15 U.S.C. § 78*lll*(14). Rather, Mitchell's claim is allowed as a general unsecured claim against the Debtor's estate.

### I. JURISDICTION AND PROCEDURE

The United States District Court for the Northern District of Illinois has exclusive jurisdiction over this proceeding pursuant to 15 U.S.C. § 78eee(b)(2)(A) and has removed this matter to this Court pursuant to 15 U.S.C. § 78eee(b)(4). The Court also has bankruptcy subject matter jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and General Rule 2.33(A) of the District Court. This claim objection is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

### II. FACTS AND BACKGROUND

The parties have stipulated to most of the material facts. Prior to December 15, 1997, Chicago Partnership Board, Inc. (the "Debtor") was a registered broker/dealer located in Chicago, Illinois, engaged in the business of buying, selling and trading a variety of limited partnership interests. The Debtor was a member of the Securities Investor Protection Corporation ("SIPC") and was registered with the Securities and Exchange Commission ("SEC"). In the ordinary course of its business, the Debtor purchased, sold and traded units of limited partnerships. The units were not offered for sale or purchase on any exchange. The Debtor offered units of limited partnerships for sale by preparing and circulating offering sheets entitled Units Available for Purchase ("UAFP") to potential purchasers. After circulating the UAFP, the Debtor attempted to sell the units listed on the UAFP by

conducting a weekly auction. Mitchell is a long-time customer of the Debtor.

On May 22, 1997, the Debtor held an auction offering for bid, one unit of Parkway Limited Partnership ("Parkway"). *See* SIPA Trustee's Exhibit No. 2. Parkway was not the subject of a registration statement filed with the SEC pursuant to the provisions of the Securities Act of 1933. *See* SIPA Trustee's Exhibit No. 34. On May 22, 1997, Mitchell submitted the winning bid ($6,000.00) at the auction for one unit of Parkway, thereby ordering the purchase of one unit of Parkway through the Debtor. *See* SIPA Trustee's Exhibit No. 2. On May 22, 1997, the Debtor created a New Buy Order for the transfer of one unit of Parkway to Mitchell and delivered a Purchase Agreement to Mitchell for execution. *See* SIPA Trustee's Exhibit Nos. 3 and 5 and Mitchell's Exhibit No. 5.

On June 3, 1997, Mitchell tendered the purchase price of $6,000.00 via check made payable to the Debtor for the one unit of Parkway to the Debtor. The check was deposited in an account in the name of the Debtor. *See* SIPA Trustee's Exhibit No. 4 and Mitchell's Exhibit No. 4. On June 6, 1997, the Debtor received the Purchase Agreement for the one unit of Parkway executed by Mitchell. *See* SIPA Trustee's Exhibit No. 5. The Debtor subsequently sent Mitchell confirmation of the Parkway transaction. *See* SIPA Trustee's Exhibit No. 6 and Mitchell's Exhibit No. 6. The seller of the Parkway unit was the Phillip E. Areeda Revocable Trust ("Areeda Trust"). *See* SIPA Trustee's Exhibit No. 7 and Mitchell's Exhibit No. 7. On June 13, 1997, the Debtor sent payment to the Areeda Trust in the amount of $5,075.00 for the purchase of the Parkway unit. *Id.*

On October 22, 1997, the Debtor supplied to Boston Financial Group ("Boston Financial"), as transfer agent, the documentation required to effectuate the Parkway transaction. *See* SIPA Trustee's Exhibit No. 8 and Mitchell's Exhibit No. 8. Before the Parkway transaction could be completed, SIPC commenced the liqui-

dation proceeding against the Debtor. *See* SIPA Trustee's Exhibit No. 9.

The Parkway unit was not registered in the Debtor or Mitchell's name, and Mitchell has not received title to the Parkway unit. The unit remains registered in the name of the Areeda Trust. Mitchell has not received the return of his $6,000.00 purchase price. The SIPA Trustee has been unable to transfer the Parkway unit into his own name due to insufficient documentation from the seller. The Parkway unit that Mitchell attempted to purchase through the Debtor is an investment in a limited partnership. Mitchell expected to receive profits from his investment in Parkway. Mitchell played no role in the management of Parkway.

On August 7, 1997, the Debtor held an auction offering for bid, one-half unit of SMR Preferred Return Development 1995, a limited partnership ("SMR"). *See* SIPA Trustee's Exhibit No. 10. SMR was not the subject of a registration statement filed with the SEC under the Securities Act of 1933. *See* SIPA Trustee's Exhibit No. 34. On August 7, 1997, Mitchell submitted the winning bid ($22,000.00) at the auction for the one-half unit of SMR, thereby ordering the purchase of one unit of SMR through the Debtor. *See* SIPA Trustee's Exhibit No. 10. On August 12, 1997, the Debtor created a New Buy Order for the transfer of the one-half unit of SMR to Mitchell and delivered a Purchase Agreement to Mitchell for execution. *See* SIPA Trustee's Exhibit Nos. 11 and 13.

On August 20, 1997, Mitchell tendered the purchase price of $22,000.00, via check made payable to the Debtor for the one-half unit of SMR. The check was deposited in an account in the name of the Debtor. *See* SIPA Trustee's Exhibit No. 12 and Mitchell's Exhibit No. 13. On August 25, 1997, the Debtor received the Purchase Agreement for the one-half unit of SMR executed by Mitchell. *See* SIPA Trustee's Exhibit No. 13 and Mitchell's Exhibit No. 14. The Debtor subsequently sent Mitch-

ell confirmation of the SMR transaction. *See* SIPA Trustee's Exhibit No. 14 and Mitchell's Exhibit No. 15. The Debtor did not transfer the purchase price to the seller of SMR prior to the initiation of this liquidation proceeding by SIPC.

The $22,000.00 purchase price for the one-half SMR unit has not been returned to Mitchell, and Mitchell has not received title to the one-half SMR unit. The one-half unit in SMR that Mitchell attempted to purchase through the Debtor is an investment in a limited partnership. Mitchell expected to receive profits from his investment in SMR. Mitchell played no role in the management of SMR.

On October 16, 1997, the Debtor held an auction offering, for bid, one-half unit of TME Partners III, L.P. ("TME"). *See* SIPA Trustee's Exhibit No. 15. TME was not the subject of a registration statement filed with the SEC under the Securities Act of 1933. *See* SIPA Trustee's Exhibit No. 34. On October 16, 1997, Mitchell submitted the winning bid ($4,600.00) at the auction for the one-half unit of TME, thereby ordering the purchase of one-half unit of TME through the Debtor. *See* SIPA Trustee's Exhibit No. 15. On October 24, 1997, the Debtor created a New Buy Order for the transfer of one-half unit of TME to Mitchell, and delivered a Purchase Agreement to Mitchell for execution. *See* SIPA Trustee's Exhibit. Nos. 16 and 18.

On November 3, 1997, Mitchell tendered the purchase price of $4,600.00, via check made payable to the Debtor for the one-half unit of TME to the Debtor. The check was deposited in an account in the name of the Debtor. *See* SIPA Trustee's Exhibit No. 17 and Mitchell's Exhibit No. 16. On November 6, 1997, the Debtor received the Purchase Agreement for the one-half unit of TME executed by Mitchell. *See* SIPA Trustee's Exhibit No. 18 and Mitchell's Exhibit No. 17.

The seller of the one-half unit of TME was Dr. Lawrence Burdge and Patricia Burdge (the "Burdges"). *See* SIPA Trust-

ee's Exhibit No. 20. On November 18, 1997, the Debtor sent payment to the Burdges in the amount of $3,947.50. *See* SIPA Trustee's Exhibit No. 20 and Mitchell's Exhibit No. 19. Before the TME transaction could be completed, SIPC commenced the liquidation proceeding against the Debtor. The one-half unit in TME is still registered in the name of the Burdges.

The SIPA Trustee has also collected interim distributions allocated to the buyer of the one-half unit in TME under the relevant transaction documents in the amount of $2,625.00. *See* Mitchell's Exhibit Nos. 20 and 21. Mitchell has not received title to the one-half unit in TME, the return of his purchase money or any distributions allocated to the buyer of the one-half unit in TME under the relevant transaction documents. The one-half unit in TME that Mitchell attempted to purchase through the Debtor is an investment in a limited partnership. Mitchell expected to receive profits from his investment in TME. Mitchell played no role in the management of TME.

On December 19, 1996, the Debtor held an auction offer for bid one unit of Prudential Bache/Fogleman Harbortown Properties ("Prudential"). *See* SIPA Trustee's Exhibit No. 21. Prudential was not the subject of a registration statement filed with the SEC under the Securities Act of 1933. *See* SIPA Trustee's Exhibit No. 34. On December 19, 1996, Mitchell submitted the winning bid at the auction for one unit of Prudential, thereby ordering the purchase of one unit of Prudential through the Debtor. *See* SIPA Trustee's Exhibit No. 21.

On January 2, 1997, Mitchell tendered the purchase price of $14,800.00 for the one unit of Prudential to the Debtor. *See* SIPA Trustee's Exhibit No. 23 and Mitchell's Exhibit No. 22. On January 10, 1997, the Debtor sent payment to the seller in the amount of $13,405.00 for the purchase of the Prudential unit. *See* SIPA Trustee's Exhibit No. 26 and Mitchell's Exhibit

No. 25. The unit was transferred to Mitchell and, on April 1, 1997, title was placed in Mitchell's name.

Prudential subsequently sent a quarterly distribution in the amount of $750.00 to the Robert Englander Revocable Trust ("Englander Trust"), the seller of the Prudential unit. *See* SIPA Trustee's Exhibit No. 28. On October 30, 1997, the Debtor requested the return of the quarterly distribution from the Englander Trust. *See* SIPA Trustee's Exhibit No. 28. On November 21, 1997, the Englander Trust sent the distribution to the Debtor. *See* SIPA Trustee's Exhibit No. 29 and Mitchell's Exhibit No. 28. On December 2, 1997, the Debtor remitted a check in the amount of $750.00 to Mitchell for payment of these distributions related to Prudential. *See* SIPA Trustee's Exhibit No. 30 and Mitchell's Exhibit No. 29. Before this check cleared, SIPC filed the liquidation proceeding against the Debtor.

Because the Debtor's accounts were frozen by the commencement of the liquidation proceeding, payment on the $750.00 check to Mitchell was stopped. Mitchell has not yet received payment of this $750.00 distribution from his interest in Prudential. The Prudential unit that Mitchell purchased through the Debtor is an investment in a limited partnership. Mitchell expected to receive profits from his investment in Prudential. Mitchell played no role in the management of Prudential.

On December 15, 1997, SIPC, a nonprofit membership corporation created by the Securities Investor Protection Act ("SIPA"), 15 U.S.C. § 78aaa *et seq.*, filed an application to the District Court for the Northern District of Illinois, seeking an order determining that the customers of the Debtor were in need of the protections afforded by SIPA and commencing a liquidation proceeding pursuant to Chapter 7 of Title 11. Pursuant to the provisions of SIPA, the District Court entered an order which, inter alia, (1) concluded that the Debtor's customers were in need of protec-tion under SIPA; (2) issued a protective decree; (3) appointed the SIPA Trustee; and (4) removed the liquidation proceeding to the United States Bankruptcy Court for the Northern District of Illinois pursuant to 15 U.S.C. § 78eee(b)(4).

On March 11, 1998, Mitchell filed a timely claim for protection as a "customer" for each of the following: (1) one unit of Parkway (Claim 1129T); (2) one-half unit of SMR (Claim 1129Z); (3) one-half unit of TME (Claim 1129AA); (4) $750.00 in quarterly distributions paid by Prudential (Claim 1129AB); and (5) $2,625.00 distribution paid by TME. *See* SIPA Trustee's Exhibit No. 31.

On December 20, 1998, the SIPA Trustee sent a Notice of Trustee's Determination of Claim to Mitchell informing him that his claim for each limited partnership interest was not a protected "customer" claim because the limited partnership interests were not "securities" as defined by SIPA. The SIPA Trustee concluded that the limited partnerships were not securities because they were not registered with the SEC. As such, the SIPA Trustee denied Mitchell's claim. *See* SIPA Trustee's Exhibit No. 32. The SIPA Trustee offered the same reason for denying each of Mitchell's claims. *Id.*

On January 1, 1999, Mitchell filed his objection to the SIPA Trustee's determination. *See* SIPA Trustee's Exhibit No. 33. In his objection, Mitchell expressly acknowledged that SIPA does not afford protection to customers for the limited partnership interests at issue:

> I am writing to you to express my concern over SIPC's response to my claim # 1129, specifically the four transactions (referenced below) related to my intended purchases of limited partnerships that have been categorized as private placements. *While I have recently come to understand that SIPC insurance does not, in fact, cover private placement LP's,* for the past 13 months I have been assured by [the Debtor's] customer rela-

tions and compliance people that SIPC was going to make all outstanding trades whole.

*See* SIPA Trustee's Exhibit No. 33 (emphasis supplied). Mitchell also expressly acknowledged that the funds he deposited with the Debtor were for the purchase of the unregistered limited partnerships: "[m]y funds, on the contrary, were remitted directly to [the Debtor] to be held in my behalf for the intended purchase of a named LP." *Id.*

Mitchell had information available to him that would have disclosed that all of the units that were the subject of the disputed trades were not registered with the SEC. The SEC has verified that Parkway, SMR, TME and Prudential were not registered pursuant to the Securities Act of 1933. *See* SIPA Trustee's Exhibit No. 34.

The issue in this matter is whether Mitchell is entitled to payment in full from the SIPC for cash he entrusted to the Debtor for the purchase of certain limited partnership interests that were never consummated by the Debtor. In order to recover, Mitchell must demonstrate that he was a "customer" of the Debtor with respect to the matters at issue and that the limited partnership interests he was attempting to acquire were "securities" as defined by SIPA. In essence, and in a rough analogy to bankruptcy parlance, Mitchell must prove his claim is entitled to the SIPA equivalent of a perfected secured claim or priority unsecured claim in order not to be treated as a general unsecured claim.

### III. *DISCUSSION*

■ "'Customer' status in a SIPA proceeding is a preferred status which gives customers priority in the distribution of certain assets marshaled by the trustee as well as entitlement to advances from the SIPC fund." *In re A.R. Baron Co., Inc.*, 226 B.R. 790, 795 (Bankr.S.D.N.Y. 1998) (citations omitted). *See also SIPC v. Stratton Oakmont, Inc.*, 229 B.R. 273, 277 (Bankr.S.D.N.Y.1999) ("Preferential treatment under SIPA is precisely that: preferential."). The term "'customer' is a term of art and its definition should be construed narrowly.... SIPA does not use 'customer' in the 'colloquial sense of 'one who buys or trades'"; instead, it is a "shorthand designation for those eligible ... to receive special protections for their investments." *In re Omni Mut., Inc.*, 193 B.R. 678, 680–81 (S.D.N.Y.1996) (*quoting In re Stalvey & Assocs., Inc.*, 750 F.2d 464, 468 (5th Cir.1985)).

■ Just as all creditors in a bankruptcy case who claim priority status have the burden of showing that they are entitled to the asserted priority under the Bankruptcy Code, Mitchell bears the burden of proving that he is the type of priority creditor known as a "customer." *See Stratton Oakmont*, 229 B.R. at 278; *A.R. Baron*, 226 B.R. at 795 ("In an ordinary bankruptcy, claimants seeking a preferred status bear the burden of showing that they are within the class of eligible persons and that their transactions are protected under the Bankruptcy Code.... The same rule applies in a SIPA case.").

■ SIPA defines "customer" in the following manner:

The term "customer" of a debtor means any person (including any person with whom the debtor deals as principal or agent) who has a claim *on account of securities* received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. *The term "customer" includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the purpose of purchasing securities....*

15 U.S.C. § 78*lll*(2) (emphasis supplied). Thus, to attain customer status, (1) the Debtor must have received, acquired, or held securities for Mitchell or (2) Mitchell must have deposited cash with the Debtor for the purpose of purchasing securities. *See Omni Mut.*, 193 B.R. at 681 ("'An investor is entitled to compensation from the SIPC only if has entrusted cash or securities to a broker-dealer who becomes insolvent . . . .'") (*quoting In re Brentwood Sec., Inc.*, 925 F.2d 325, 327 (9th Cir.1991)). "A claim based on 'cash' under SIPA has two elements: (1) the cash must be on deposit with a broker-dealer; and (2) it must have been paid for the purpose of purchasing securities." *Id.* (citation omitted).

It is undisputed that Mitchell has entrusted "cash" totaling $32,600.00 to the Debtor. There is no dispute that this cash was entrusted by Mitchell to the Debtor to acquire limited partnership interests and that the Debtor deposited the funds into its brokerage account. Also, there is no dispute that this cash was entrusted to the Debtor by Mitchell for the purchase by Mitchell of interests in three limited partnerships: Parkway, SMR and TME. Also, it is undisputed that Mitchell has not received title to any of these three limited partnerships interests, and with respect to SMR, the seller has not been paid the $22,000.00 that Mitchell paid to the Debtor to procure his one-half interest in SMR. Thus, the question of whether Mitchell is a defined "customer" under SIPA entitled to preferred treatment thereunder, hinges on whether he has a claim against the Debtor for "securities" protected under SIPA. This question is where the real dispute lies in this matter.

SIPA defines security as the following: *The term "security" means* any note, stock, treasury stock, bond, debenture, evidence of indebtedness, any collateral trust certificate, preorganization certificate or subscription, transferable share, voting trust certificate, certificate of deposit, certificate of deposit for a securi-

ty, any *investment contract* or certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or mineral royalty or lease *(if such investment contract or interest is the subject of a registration statement with the Commission pursuant to the provisions of the Securities Act of 1933 [15 U.S.C.A. § 77a et seq.])*, any put, call, straddle, option, or privilege on any security, or group or index of securities (including any interest therein or based on the value thereof), or any put, call straddle, option or privilege entered into on a national securities exchange relating to foreign currency, any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase or sell any of the foregoing, *and any other instrument commonly known as a security.* Except as specifically provided above, the term "security" does not include any currency, or any commodity or related contract or futures contract, or any warrant or right to subscribe to or purchase or sell any of the foregoing.

15 U.S.C. § 78*lll*(14) (emphasis supplied). Absent from this definition is any reference to limited partnership or interests in a limited partnership. Mitchell contends that the limited partnership interests should be categorized as "investment contracts," or in the alternative, as "any other instrument commonly known as a security."

Certain courts have employed the Supreme Court's three-prong test in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) to classify a limited partnership as an investment contract for purposes of the Securities Act of 1933 and the Securities and Exchange Act of 1934. The Supreme Court stated in *Howey*, "an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits sole-

734

ly from the efforts of the promoter or a third party...." *Id.* at 298–99, 66 S.Ct. 1100.

■ However, unlike the Securities Act of 1933 and the Securities and Exchange Act of 1934, SIPA's definition of "security" protected under that Act does not include all investment contracts. Rather, an investment contract is a "security" under SIPA only if such investment contract is the subject of a registration statement under the Securities Act of 1933. *See* 15 U.S.C. § 78*lll*(14) ("any investment contract ... if such investment contract or interest is the subject of a registration statement with the Commission pursuant to the provisions of the Securities Act of 1933...."). While the definition of "security" under SIPA is similar to the definition of "security" provided under the 1933 and 1934 Acts, an "investment contract" is a "security" for purposes of the 1933 and 1934 Acts regardless of whether or not a registration statement under the Securities Act of 1933 has been filed.

The legislative history of SIPA articulates why Congress chose to distinguish the definition of "security" under SIPA:

> The present SIPA defines "security" by reference to section 60e of the Bankruptcy Act. That section, however, does not itself define the term. The bill adds a new definition of "security" patterned after the definition contained in the Securities Exchange Act of 1934. *That definition is not followed exactly, however, since the purpose of the 1934 act and SIPA are different.*
>
> Commodity contracts and options relating thereto *are excluded, as are investment contracts, profit sharing plans, and an interest or participation in oil and gas leases which are not issued in a distribution pursuant to a registration statement filed with the Commission under the provisions of the Securities Act of 1933.*

S.Rep. No. 763, 95th Cong.2d Sess. 17 (1978), *reprinted in* 1978 U.S.C.C.A.N. 764, 780 (emphasis supplied).

The starting point for the SIPA definition was the definition under the 1934 Act, which served enforcement and regulatory purposes. Thus, the definition had to be revised to implement the goals of SIPA. The former chairman of SIPC testified at hearings on the 1978 amendments:

> [A] definition of [the term security] is set forth in proposed Section 16(14). The starting point for this definition is the definition in the Securities Exchange Act of 1934. Recognizing, however, that the term is defined there for enforcement and regulatory purposes, and that a definition tailored to the purposes of the 1970 Act is necessary, some modifications have been made. For example, *the proposed definition excludes investment contracts and oil and gas interests which are not registered with the Commission under the Securities Act of 1933 since we have concluded that, while it is important to have them included in a definition for enforcement purposes, they are not the types of investments which should be protected by SIPC.*

Hearing on H.R. 8331 Before the Subcomm. on Consumer Prot. and Fin. of House Comm. on Interstate and Foreign Commerce, 95th Cong., 1st Sess. 95–96 (Aug. 1, 1977) (statement of Hugh F. Owens, Chairman SIPC) (emphasis supplied).

The Ninth Circuit Court of Appeals addressed the issue at bar in *In re Brentwood Sec., Inc.*, 925 F.2d 325 (9th Cir. 1991). The court concluded that the claimant's interest in a limited partnership is not a security as defined by SIPA because the limited partnership was not registered pursuant to the Securities Act of 1933:

> McMurray filed two other claims with the SIPC. First, she claimed $10,000 in connection with her attempted investment in a limited partnership known as Communications Development Company (CDC). The SIPC denied this claim, but the bankruptcy court granted it.

The BAP reversed the bankruptcy court, concluding that this investment was not covered by the SIPA in any event. We affirm this decision. McMurray's interest in CDC was not a security as defined by the SIPA because CDC was not registered with the SEC pursuant to the Securities Act of 1933. *Id.* at 329 (citations omitted). *See also Omni Mut.,* 193 B.R. at 682 (noting that it was uncontested that the limited partnership interests were not registered with the SEC and thus failed to qualify as a "security" pursuant to SIPA).

Mitchell argues that the limited partnership interests at bar are securities and cites to *Goodman v. Epstein,* 582 F.2d 388 (7th Cir.1978), *cert. denied,* 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979) in support of this proposition. In *Epstein,* the Seventh Circuit employed a three-prong test for determining whether a security exists: "[t]he basic test which has been enunciated by the Supreme Court for determining the existence of a security involves three elements: (1) an investment in a common venture (2) premised on a reasonable expectation of profits (3) to be derived from the entrepreneurial or managerial efforts of others...." *Id.* at 406 (citation omitted). The *Epstein* court concluded that the limited partnership interests were securities.

The *Epstein* case, however, is distinguishable and not controlling in this matter as it was not decided under SIPA. Rather, the *Epstein* case was decided under the Securities Exchange Act of 1934. This distinction is fatal to Mitchell's argument because SIPA requires that an investment contract must be the subject of a registration statement under the Securities Act of 1933, whereas under the Securities Exchange Act of 1934, an investment contract is a security regardless of whether or not a registration statement has been filed under the Securities Act of 1933. Thus, even if Mitchell could establish that the limited partnership interests are "investment contracts" under the three-prong test, Mitchell has stipulated that the limited partnerships were not registered under the Securities Act of 1933. Accordingly, the Court finds that the *Epstein* case is distinguishable and inapposite from the matter at bar.

In short, the Court finds that the subject limited partnerships are not "investment contracts" as defined under SIPA because they were not registered with the SEC pursuant to the Securities Act of 1933, and are effectively excluded from the statutory text by the first parenthetical of § 78*lll*(14).

Next, Mitchell argues that the subject limited partnerships fall within the "any other instrument commonly known as a security" under SIPA. *See* 15 U.S.C. § 78*lll*(14). Mitchell cites no case for this proposition. The Court was unable to find any case that held that a limited partnership falls under that catch-all category of defined securities. Both the *Brentwood Sec.* and the *Omni Mut.* cases found that limited partnerships fall under the "investment contracts" portion of the statute. Neither of these cases discussed the general "any other instrument" clause. The Court rejects Mitchell's argument and will follow the *Brentwood Sec.* court's view.

An accepted principle of statutory construction is that the specific prevails over the general. *In re Churchill Properties III, Limited Partnership,* 197 B.R. 283, 288 (Bankr.N.D.Ill.1996) (citations omitted). When forced to choose between a specific statutory provision and a general savings clause, the Court should err on the side of the specific provision in the belief that it reflects congressional intent more clearly. *See In re Lifschultz Fast Freight Corp.,* 63 F.3d 621, 629 (7th Cir.1995) (citation omitted). The Court finds that limited partnership interests more appropriately fall under the language of "investment contracts" under § 78*lll*(14) of SIPA, not under the general catch-all provision of "any other instrument commonly known as a security." It would be

redundant to find they fit into both pigeon-holes; they should fit in one or the other. Moreover, Congress seems to have intended SIPA preferred customer protection to be afforded to investment contracts registered with the SEC and not those not registered. Accordingly, the Court rejects Mitchell's contention that the limited partnerships are "securities" under SIPA because they constitute "any other instrument commonly known as a security."

Furthermore, the Court finds that Mitchell's subjective belief that he was protected by SIPA does not give him customer status under SIPA, nor does it entitle him to the protections afforded to customers by SIPA. *Omni Mut.*, 193 B.R. at 682 (claimant's "subjective belief that [unregistered limited partnership] interests would be protected by SIPA, regardless of how reasonable that belief may have been, is not sufficient to find that . . . he had purchased a 'security' as . . . defined by SIPA."). Moreover, Mitchell may not invoke the Court's equitable powers to circumvent the requirements and express language of SIPA:

> [A]rguments based solely on the equities are not, standing alone, persuasive. If equity were the criterion, most customers and creditors of . . . the bankrupt . . . would be entitled to reimbursement for their losses. Experience, on the other hand, counsels that they will have to settle for much less. *SIPA was not designed to provide full protection to all victims of a brokerage collapse. Its purpose was to extend relief to certain classes of customer.*

*SEC v. Packer, Wilbur & Co., Inc.*, 498 F.2d 978, 983 (2d Cir.1974) (emphasis supplied). Furthermore, even if the Debtor had a duty to disclose that Mitchell's transactions were not protected by SIPA, Mitchell does not have a customer claim under SIPA. *See In re Oberweis Sec., Inc.*, No. 89 B 11283, 1992 WL 119272 at *8 (Bankr.N.D.Ill. May 21, 1992) ("As a matter of law, this Court finds that [the claimant] is not entitled to recovery against the Securities Investor Protection Corporation . . . in the form of a customer claim based on [the debtor's] alleged breach of contractual, statutory, regulatory, or common law duties. . . ."); *Barton v. SIPC*, 182 B.R. 981, 985 (Bankr.D.N.J. 1995) (breach of contract or fraud action not covered by SIPA).

In sum, the Court holds that the limited partnerships at issue are not "investment contracts" under § 78*lll*(14) of SIPA because they were not the subject of a registration statement under the Securities Act of 1933. Further, the Court holds that the limited partnerships are not "any other instrument commonly known as a security" under that section of SIPA. Because Mitchell purchased limited partnership units which were not registered under the Securities Act of 1933, Mitchell did not purchase "securities" as defined under the relevant section of SIPA and therefore does not have (1) a customer claim on account of securities received, acquired, or held by the Debtor or (2) a customer claim for cash deposited with the Debtor for the purposes of purchasing securities. Thus, Mitchell is not a "customer" as defined by SIPA and he is not entitled to the preferred protections afforded by SIPA.

Hence, Mitchell must look only to the Debtor's estate for satisfaction of his claims rather than to funds furnished by SIPC. *See SIPC v. Associated Underwriters, Inc.*, 423 F.Supp. 168, 171 (D.Utah 1975) (citation omitted). If a claimant is not a "customer" as defined by SIPA, such claimant becomes a general unsecured creditor of the debtor's estate. *Stratton Oakmont*, 229 B.R. at 277. Mitchell's claims are general unsecured claims which are not entitled to preferred status as customer claims under SIPA. Consequently, the Court sustains the Trustee's determination to disallow the claim of Mitchell. The claim is allowed only as general and unsecured.

## IV. CONCLUSION

For the foregoing reasons, the Court sustains the SIPA Trustee's determination

to disallow the claim of Paul M. Mitchell as a "customer" claim. Mitchell's claim is allowed as a general unsecured claim against the Debtor's estate.

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.